UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                   :

JENEBA LADEPO,                       :
                                   :
                    Plaintiff,    :
                                   :
          - against -       :
                                   :

UNITED CEREBRAL PALSY OF NEW   :
YORK CITY, INC.,                :
                                   :
                    Defendant.  :
                                   :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/12/2018___

15-CV-7026 (VSB)

**OPINION & ORDER**

Appearances:

Joseph Myers
Frank & Associates, P.C.
Farmingdale, New York 11735
*Counsel for Plaintiff*

Mary E. Donnelly
Barbara M. Maisto
Steven A. Zuckerman
Putney, Twombly, Hall & Hirson LLP
New York, New York 10175
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Jeneba Ladepo brings this action against Defendant United Cerebral Palsy of

New York City, Inc. ("UCP" or "Defendant") alleging claims for (1) retaliation under the Family

and Medical Leave Act of 1993 ("FMLA"), as amended, 29 U.S.C. § 2601, *et seq.*; (2)

interference under the FMLA; and (3) associational discrimination under the New York City

Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, *et seq.* Before me is

Defendant's motion for summary judgment as to all of Plaintiff's claims. Because Plaintiff has

presented sufficient evidence to create a genuine issue of material fact as to her interference and

associational discrimination claims, but not as to her retaliation claim, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I.    <u>Background</u>[1]

### A.    *UCP Hires Plaintiff*

UCP is a non-profit agency that provides social services to individuals with cerebral palsy and other developmental disabilities in New York City.  (Counter 56.1 ¶ 1.)[2]  Those services include preschool programs, residential programs, clinics for the developmentally disabled, adult day programs, universal pre-kindergarten, school age education, and family support services.  (*Id.*)  One of UCP's residential programs is the Castleton Individualized Residential Alternative ("Castleton IRA") in Staten Island.  (*Id.* ¶¶ 1–2.)

UCP hired Plaintiff on February 22, 2005 as a Residence Program Specialist at Castleton IRA.  (*Id.* ¶ 3.)  Her duties included providing care and assisting residents with developmental and daily living functions such as meal planning, personal hygiene, activities, shopping, and transportation.  (*Id.* ¶ 4.)  The job description for Plaintiff's position stated that it required "good interpersonal skills necessary to interact effectively with coworkers, employees, residents and their families."  (*Id.* ¶ 5.)

### B.    *UCP's Policies and Procedures*

Plaintiff received a copy of UCP's Employee Handbook, which contained UCP's policies and procedures.  (*Id.* ¶¶ 8–9.)  UCP's policies and procedures include UCP's Equal Employment Opportunity and Non-Harassment Policies, which prohibit discrimination and retaliation on the basis of any classification protected by law and provide employees with a complaint procedure to

---

[1] The facts in this background section are undisputed unless otherwise noted.

[2] "Counter 56.1" refers to Plaintiff's Rule 56.1 Counter-Statement in Opposition to Defendant's Motion for Summary Judgment, filed July 28, 2017.  (Doc. 59.)

raise concerns of discrimination.  (*Id.* ¶¶ 10–11.)  The policies and procedures also include

UCP's Employee Conduct and Code of Conduct policies, which provide, among other things,

that an employee who engages in insubordination, refuses to perform assigned duties, fails to

administer medication to program participants, removes property from UCP without

authorization, and/or fails to abide by UCP's policies and practices may be subject to discipline,

up to and including the termination of her employment.  (*Id.* ¶ 12.)  With regard to the removal

of UCP property, UCP's Agency Property policy states that employees may not engage in

"improper and unauthorized use and removal of Agency property, information, office equipment

or supplies from UCP/NYC premises," and prohibits the use or misuse of confidential

information.  (*Id.* ¶¶ 13–14.)

UCP's policies and procedures also included several policies related to attendance,

timekeeping, and leave.  (*Id.* ¶¶ 15–19.)  The Attendance and Punctuality Policy provides that

employees who are unable to report to their scheduled shifts must notify their supervisor as far in

advance as possible, and at least one hour before the start of their scheduled day shift and two

hours before the start of their scheduled night or weekend shift.  (*Id.* ¶ 15.)  It further provides

that UCP may ask employees to provide medical documentation for any absence due to illness

and that an employee's repeated absence or failure to notify a supervisor of an absence will result

in disciplinary action for just cause.  (*Id.* ¶ 16.)  UCP's Time Keeping Policy also requires

employees to sign in and out of work every day.  (*Id.* ¶ 17.)  Finally, UCP's FMLA Policy

requires employees to submit written notice of the need for FMLA leave at least thirty days

before the start of their leave when the need for leave is reasonably foreseeable.  (*Id.* ¶ 19.)  If the

need for leave is not reasonably foreseeable, employees must provide written notice as soon as

possible.  (*Id.*)

### C.  *Plaintiff's 2008 and 2013 Requests for FMLA Leave*

Plaintiff requested and was approved for FMLA leave on two occasions, in 2008 and 2013, prior to the alleged requests at issue in this litigation.  (*Id.* ¶ 20.)  Plaintiff first requested FMLA leave in 2008 because of injuries she sustained in a car accident.  (*Id.* ¶ 21.)  On February 6, 2008, Plaintiff provided UCP a physician's note stating that she had suffered injuries in a car accident on January 29, 2008.  (*Id.* ¶ 24.)  UCP conditionally approved Plaintiff's request on the same day, pending receipt of an appropriate medical certification.  (*Id.* ¶ 25.)  Plaintiff's physician submitted a Medical Certification Form to UCP on February 25, 2008, and UCP approved Plaintiff's request.  (*Id.* ¶ 26.)  On April 11, 2008, Plaintiff's physician submitted a letter advising UCP that Plaintiff could safely return to work "without restriction" on April 14, 2008, and Plaintiff returned to her position on that date.  (*Id.* ¶¶ 27–28.)

On November 4, 2008, Plaintiff's son was the victim of a brutal assault and hate crime, suffering serious head injuries that led to chronic seizures in 2013 and 2014 requiring continued hospitalization.  (Ladepo Aff. ¶¶ 3–11.)[3]  Plaintiff's second request for FMLA leave was on March 4, 2013 in connection with the need to care for her son, (Counter 56.1 ¶ 29), and she submitted a Family and Medical Leave Application Request Form and medical documentation to Tiffany Harkless, the former Director of Castleton IRA, (*id.* ¶ 30).  UCP approved the request for FMLA leave for one month that same day.  (*Id.* ¶ 31.)  Plaintiff returned to work on March 30, 2013.  (*Id.* ¶ 32.)

### D.  *Plaintiff's Alleged 2014 Requests for FMLA Leave*

Plaintiff claims in her affidavit that she requested FMLA leave again on multiple occasions in 2014 to take care of her son, whose seizures became worse and more frequent.

---

[3] "Ladepo Aff." refers to the Affidavit of Jeneba Ladepo, filed July 28, 2017.  (Doc. 56.)

(Ladepo Aff. ¶¶ 11–22.)  Defendant disputes that Plaintiff sought FMLA leave.  (*See* Jefferally

Aff. ¶ 38.)[4]  I initially describe Plaintiff's numerous alleged requests for FMLA leave in 2014,

and then discuss the nature of the factual disputes.

Plaintiff claims that in or around the first week of February 2014, she called John

Jefferally—the Assistant Director of Castleton IRS,[5] (*id.* ¶ 3)—to request time off to take her son

to the hospital after he had a seizure, (Ladepo Aff. ¶ 12).  In response, Jefferally "angrily told

[Plaintiff] to 'get someone else to take care of [her] son.'"  (*Id.*)  Jefferally ultimately granted

Plaintiff's request after she pleaded with him for several minutes.  (*Id.* ¶ 13.)

Plaintiff's son had another seizure in the third week of February 2014, which caused him

to suffer a fracture in his face requiring surgery the next week.  (*Id.* ¶ 14.)  Plaintiff claims she

made a request to Jefferally for three days of FMLA leave to care for her son and asked him to

provide the paperwork to make the request.  (*Id.* ¶ 15.)  Jefferally stated that he would not

approve any leave requests because there was not enough staff to cover for Plaintiff, and he did

not provide Plaintiff with the FMLA forms.  (*Id.* ¶ 16.)

In March 2014, Plaintiff again requested leave from Jefferally when she learned that her

son needed an EKG that would take about two days.  (*Id.* ¶ 17.)  Jefferally told her that she

needed to find another person to take care of her son and denied her leave request due to the lack

of staff to cover for Plaintiff.  (*Id.* ¶ 18.)

Plaintiff requested FMLA leave again in late June 2014 after her son had another seizure,

but she was again denied and forced to miss several days of work to care for her son.  (*Id.* ¶ 19.)

Finally, on July 4, 2014, Plaintiff's son had another seizure that required Plaintiff to stay with

---

[4] "Jefferally Aff." refers to the Affidavit of John Jefferally, filed June 30, 2017.  (Doc. 52.)

[5] References to an individual's job title refer to the job title that individual held during the period relevant to this action.

him in the hospital for three days.  (*Id.* ¶ 20.)  When Plaintiff returned to work on July 7, 2014,

she provided Jefferally her son's medical documentation and requested FMLA leave.  (*Id.* ¶ 21.)

Jefferally refused to look at the medical documentation, told Plaintiff to find someone else to

take care of her son, and denied Plaintiff's request for FMLA leave.  (*Id.* ¶ 22.)  Plaintiff was

fired on July 10, 2014.  (*Id.* ¶ 23.)

Defendant disputes that Plaintiff made these requests.  Jefferally claims that Plaintiff

never made a request for FMLA leave to him in 2014, never provided him any completed FMLA

leave request forms or medical documentation, and never complained to him about any alleged

denial of FMLA leave.[6]  (Jefferally Aff. ¶ 38.)  Plaintiff contends that she did in fact provide

Jefferally with FMLA paperwork at some point in June or July 2014, as well as records

reflecting her son's diagnosis.  (Counter 56.1 ¶ 35; Ladepo Dep. 159:9-161:19.)  However, there

is no dispute that UCP subpoenaed Plaintiff's son's 2014 medical records from his medical

providers, and those records do not reflect that Plaintiff requested any providers to complete any

FMLA paperwork or medical certification forms.  (Counter 56.1 ¶ 34.)  Plaintiff's deposition

testimony appears to suggest that when she spoke to her son's doctor regarding FMLA

paperwork, the doctor told her that the diagnosis records would be sufficient to request FMLA

---

[6] Defendant also asserts in its reply memorandum that Plaintiff testified at her deposition that Jefferally did not actually deny Plaintiff's FMLA leave request, but rather never gave her UCP's FMLA forms.  (Def.'s Reply 3.) However, Defendant's citations only support part of that proposition.  Plaintiff testified that Jefferally never gave her UCP's FMLA forms, (*see* Ladepo Dep. 216:22-217:12, 249:3-5, 253:16-254:11), but she did not testify that Jefferally never denied her leave.  Rather, Plaintiff testified that, in response to at least one request, Jefferally told Plaintiff that he did not have anyone to fill Plaintiff's shifts and could not do anything about or approve Plaintiff's requests, (*id.* at 248:21-249:2, 251:5-11, 260:14:261:8).

"Def.'s Reply" refers to the Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, filed August 10, 2017.  (Doc. 60.)

"Ladepo Dep." refers to the depositions of Plaintiff, conducted on November 15, 2016 and March 13, 2017, excerpts of which are attached as Exhibit C to the Donnelly Declaration, (Doc. 50-3), and Exhibit A to the Myers Declaration, (Doc. 57-1).  In addition, full versions of the depositions were submitted to my chambers on a CD-ROM.

leave.  (Ladepo Dep. 157:14-158:20.)

        **E.**        ***Plaintiff's Work Performance***

Defendant submits a list of sixteen purported occasions that Plaintiff was disciplined and/or counseled during her tenure at UCP.  (Counter 56.1 ¶ 36.)  Plaintiff concedes that she was counseled and/or disciplined on, at most, fourteen occasions.  (*Id.*)

The parties agree that on one occasion, Plaintiff was reprimanded for failing to administer medication to residents, a violation of UCP's Code of Conduct.  (*Id.* ¶¶ 50–53.)  Defendant asserts that Plaintiff was reprimanded for failing to administer medication on one prior occasion. (*Id.* ¶ 45.)  Plaintiff claims she did not fail to administer medication on this occasion, but concedes that "UCP filed a medication error reporting form to document Plaintiff's failure to administer the medication."  (*Id.* ¶¶ 45–46.)

The parties agree that on three occasions, Plaintiff was counseled or reprimanded for other misconduct, such as refusing to be interviewed by an investigator in connection with an ongoing investigation, failing to complete a written record tracking the physical turning and positioning of residents in their beds, and leaving a medication key on top of a cart while administering medication to a resident.  (*Id.* ¶¶ 41–44, 58–59, 60–62.)  Plaintiff was counseled or reprimanded on four other occasions for other misconduct—such as speaking over a co-worker, yelling about co-workers in front of residents, yelling about being transferred from her assigned apartment in front of residents, and failing to correctly complete a resident's bowel movement chart—but Plaintiff either disputes that the misconduct that was the purported basis for the counseling or reprimand occurred, or objects to the cited evidence documenting the misconduct as hearsay.  (*Id.* ¶¶ 47–49, 91–92, 94–95, 100–02.)

The parties agree that on one occasion, Plaintiff was reprimanded for insubordination in

violation of UCP's Code of Conduct.[7]  (*Id.* ¶¶ 72–73.)  Plaintiff was reprimanded for insubordination on two other occasions, but Plaintiff disputes some or all of the conduct that was the purported basis for the reprimands.  (*Id.* ¶¶ 37–40, 74–81.)

 There is significant dispute with regard to Plaintiff's last warning for insubordination. Defendant claims that on January 28, 2014, Plaintiff refused the instruction of Tracy McTiernan, the former Residential Manager at Castleton IRA, to drive a resident to his or her second set of appointments.  (*Id.* ¶¶ 74–76.)  Plaintiff disputes that she refused to drive the resident.  (*Id.*)  On January 29, 2014, Plaintiff refused the instruction of McTiernan to assist bringing groceries into a resident's apartment.  (*Id.* ¶¶ 77–79.)  Plaintiff does not dispute this fact.  (*Id.*)  On February 26, 2014—shortly after Plaintiff claims Jefferally denied one of her requests for FMLA leave, (Ladepo Aff. ¶¶ 14–16)—UCP completed a "Disciplinary Action Notice Form" describing the January 28 and 29 incidents, as well as another incident on February 18, 2014 concerning a confrontation Plaintiff had with management about being assigned a different apartment.  (Myers Decl. Ex. G.)[8]  The form noted that this was Plaintiff's "Second Written Warning" and that it was being taken for insubordination.  (*Id.*)  The form was never signed by Plaintiff or any supervisor, and there is no indication that it was ever issued.  (*Id.*)  On March 11, 2014, Defendant issued a separate "Disciplinary Action Notice Form" recounting in identical language as the February 26 form the events of January 28 and 29.  (*Id.* Ex. F.)  This form, however, did not include a description of the February 18, 2014 incident.  (*Id.*)  It noted that this was Plaintiff's "Final Warning" as opposed to her "Second Written Warning," as the February 26 form did.  (*Id.*)

---

[7] Although Plaintiff does not dispute the conduct underlying the November 11, 2013 written warning for insubordination, (Counter 56.1 ¶ 72), she does not recall one of the underlying incidents, (*id.* ¶ 73).

[8] "Myers Decl." refers to the Declaration of Joseph Myers, filed July 28, 2017.  (Doc. 57.)

Plaintiff was also purportedly counseled and/or reprimanded on various occasions for issues related to attendance and time-keeping. In July and August 2011, Plaintiff called out sick on three occasions. (Counter 56.1 ¶¶ 54–56.) On August 10, 2011, the Residence Manager at Castleton IRA at the time counseled Plaintiff for excessive unplanned absences; such absences violated UCP's Attendance and Punctuality Policy. (*Id.* ¶ 57.) Plaintiff does not recall these incidents, but does not dispute that they occurred. (*Id.* ¶¶ 54–57.) On January 12, 2013, Plaintiff failed to punch in or out of work, in violation of UCP's Timekeeping Policy, which resulted in Tiffany Harkless, the Director of Castleton IRA at the time, counseling Plaintiff. (*Id.* ¶¶ 63–64.) Plaintiff again does not recall these incidents, but does not dispute that they occurred. (*Id.*) On January 16, 2013, Plaintiff allegedly failed to attend a mandatory staff meeting without prior notice or approval and was counseled by Harkless, but Plaintiff disputes that she missed the meeting and that she was counseled by Harkless. (*Id.* ¶¶ 65–66.)

Plaintiff called out from work for several days between May 28, 2014 and June 29, 2014, (*id.* ¶¶ 107–09), a time period that coincides with the seizures Plaintiff's son's suffered that required her to take leave, (Ladepo Aff. ¶ 19). As a result of these absences, a meeting was held on June 30, 2014 with Jefferally and Brian Centrone, Director of Castleton IRA, to discuss Plaintiff's sick time and history of excessive call outs. (Counter 56.1 ¶¶ 107–09.) At the June 30, 2014 meeting, Centrone advised Plaintiff that her absences, poor work performance, and insubordination were detrimental to Castleton IRA's ability to provide services to its residents. (*Id.* ¶ 110.) Defendant claims Plaintiff responded in an unprofessional manner and refused to produce medical documentation for her absences, but Plaintiff disputes this claim and states that in July 2014 she provided medical records regarding her absences. (*Id.* ¶ 111.) Finally, Plaintiff was absent again for several days between July 3, 2014 and July 7, 2014, (*id.* ¶ 118), a time

period that again coincides with Plaintiff's purported need to take leave to care for her son after he suffered a seizure, (Ladepo Aff. ¶ 20).

## F.  *The Termination of Plaintiff's Employment*

On May 13, 2014, Kristen Elkins, a Coordinator of Operations and Investigator at UCP, recommended to Karen Bethel, Director of Human Resources, and Dahlian Porter, Director of Residential Services, that UCP terminate Plaintiff's employment based on Plaintiff's insubordination and "inability to manage her emotions and remain professional in front of [residents]." (Counter 56.1 ¶ 98; Elkins Aff. Ex. A.)[9]  On June 30, 2014—the same day Centrone and Jefferally met with Plaintiff about her absences—Centrone sent an email to Jefferally, Bethel, Elkins, and Porter recommending that UCP terminate Plaintiff's employment. (Counter 56.1 ¶¶ 113–14.)  Elkins responded to that email, adding Gary Dreyfuss, Director of Human Resources, summarizing Plaintiff's incidents of confrontation and insubordination since receiving the final written warning on March 11, 2014, and recommending that UCP terminate Plaintiff's employment.  (*Id.* ¶¶ 115–17; Elkins Aff. Ex. A.)

On July 10, 2014—three days after Plaintiff returned from her absence due to her son's seizure and resulting hospital stay, (Ladepo Aff. ¶¶ 20–21)—Centrone, Elkins, and Jefferally met with Plaintiff and her Union representative, (Counter 56.1 ¶ 119).  At the meeting, Centrone requested that Plaintiff return a counseling memorandum that she purportedly snatched from a nurse's desk during a counseling meeting on May 28, 2014 and refused to return, despite repeated requests, in violation of UCP's Code of Conduct and Standards of Professional Behavior.  (*Id.* ¶¶ 102–06, 120.)  Plaintiff disputes that she snatched the memorandum or was

---

[9] "Elkins Aff." refers to the Affidavit of Kristen Elkins in Support of UCP's Motion for Summary Judgment, and attached exhibits, filed June 30, 2017.  (Doc. 53.)

ever asked to return it, instead claiming that Jefferally gave it to her.[10]  (*Id.* ¶¶ 120–22.)  During the July 10 meeting, Centrone informed Plaintiff that UCP was terminating her employment. (*Id.* ¶ 124.)  Defendant claims the basis provided for terminating her employment was poor job performance and insubordination, while Plaintiff claims it was for "snatching" the counseling memorandum.  (*Id.* ¶¶ 124–25.)

### G. *Plaintiff's Grievances*

Throughout Plaintiff's employment at UCP, the United Federation of Teachers, Local 2, NYSUT, AFT, AFL-CIO (the "Union") represented her pursuant to a collective bargaining agreement that governed the terms and conditions of Plaintiff's employment.  (*Id.* ¶¶ 6–7.)  After Plaintiff received the final written warning for insubordination on March 11, 2014, the Union filed a Step 1 grievance on Plaintiff's behalf.  (*Id.* ¶ 82.)  Plaintiff sent a letter to the Union, dated March 22, 2014, alleging that she was the victim of mistreatment by UCP, but her letter did not allege that UCP denied her requests for FMLA leave.  (*Id.* ¶¶ 83–84.)  The Union's Step 1 grievance was denied on March 27, 2014.  (*Id.* ¶ 85.)  It filed a Step 2 grievance on April 2, 2014 concerning the final written warning.  (*Id.* ¶ 86.)  After a grievance hearing held before Bethel, UCP denied the Union's Step 2 grievance on the basis that UCP had just cause for issuing the final warning.  (*Id.* ¶¶ 87–88.)  On June 10, 2014, the Union advised Plaintiff that it could not successfully pursue Plaintiff's grievance to arbitration.  (*Id.* ¶ 89.)

On July 21, 2014, Plaintiff's Union representative filed a Step 1 grievance objecting to Plaintiff's termination, which was denied.  (*Id.* ¶¶ 126–27.)  The Union then filed a Step 2 grievance, which was also denied after a hearing.  (*Id.* ¶¶ 128–33.)  At the hearing, Elkins and Jefferally testified that Plaintiff was terminated for poor job performance and insubordination.

---

[10] Ultimately, Plaintiff produced the memorandum in discovery.  (Counter 56.1 ¶ 123.)

(*Id.* ¶ 132.)  The Union subsequently informed Plaintiff that it could not successfully pursue

Plaintiff's grievance to arbitration.  (*Id.* ¶ 134.)

## II.     <u>Procedural History</u>

Plaintiff filed this action on September 4, 2015, (Doc. 1), and Defendant answered the

Complaint on November 20, 2015, (Doc. 8).  After the parties completed discovery, Defendant

moved for summary judgment on June 30, 2017.  (Docs. 48–54.)  On July 28, 2017, Plaintiff

filed her opposition memorandum, supporting affidavits and declarations, and a counter-

statement to Defendant's Rule 56.1 statement.  (Docs. 56–59.)  Defendant filed its reply

memorandum on August 10, 2017.  (Doc. 60.)

## III.    <u>Legal Standards</u>

Summary judgment is appropriate when "the parties' submissions show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).

"[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the

governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."

*Id.*

On a motion for summary judgment, the moving party bears the initial burden of

establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the

nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at

256, and to present such evidence that would allow a jury to find in his favor, *see Graham v.

Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

However, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal

quotation marks omitted).  Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor."  *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

IV.    **Discussion**

Defendant seeks summary judgment against Plaintiff's claims for retaliation and interference under the FMLA and associational discrimination under the NYCHRL.  I address each claim in turn.

A.    *Retaliation*

1.    **Applicable Law**

A plaintiff may make out a claim for retaliation under the FMLA where an employer discriminates against her for exercising her right to take FMLA leave.  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174–77 (2d Cir. 2006).  At the summary judgment stage, retaliation claims under the FMLA are analyzed under the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Sista*, 445 F.3d at 174–77.  Accordingly, a plaintiff must first establish a prima facie case by showing that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (internal quotation marks omitted).

If the plaintiff establishes a prima facie case, the defendant must provide a legitimate, non-discriminatory reason for its actions.  *Id.*  If the defendant succeeds, then the plaintiff must show that the defendant's explanation is a pretext for discrimination.  *See id.*  However, a

plaintiff need not show that the exercise of her FMLA rights was the "but-for" cause of the employer's adverse employment action; rather, a plaintiff may overcome summary judgment by showing that her request for FMLA leave was at least one "motivating factor" in the employer's decision. *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017); *see also Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 205 (S.D.N.Y. 2009) ("To defeat summary judgment, [plaintiff] need not show that defendants' proffered reason was false or played no role in the decision to terminate him, but only that it was not the only reason, and that his filing for FMLA leave was at least one motivating factor.") The burden of persuasion remains at all times with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

### 2. Application

Defendant contends that Plaintiff has failed to establish a prima facie case of retaliation, but even if she had, UCP has articulated legitimate reasons for Plaintiff's termination and Plaintiff has failed to show those reasons were pretextual. (Def.'s Mem. 14–22.)[11] I find that Plaintiff has failed to establish a prima facie case, and thus, summary judgment is warranted against Plaintiff's retaliation claim.

Defendant argues that Plaintiff has failed to establish a prima facie case because Plaintiff failed to present sufficient evidence that: (1) she exercised her rights under the FMLA; (2) she satisfactorily performed her job; or (3) her termination occurred under circumstances giving rise to an inference of retaliatory intent. (*Id.* at 15–19.)

Plaintiff has presented sufficient evidence to create a genuine issue of fact as to whether

---

[11] "Def.'s Mem." refers to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, filed June 30, 2017. (Doc. 54.)

she exercised her FMLA rights by making a request for FMLA leave during the relevant time period. Plaintiff's affidavit states that she made five separate requests to Jefferally for FMLA leave between February and July 2014 to care for her son, the last four of which Jefferally denied. (Ladepo Aff. ¶¶ 12–22.) Plaintiff recounts the specific time period each request was made, the reason for each request, and Jefferally's response to each request. (*Id.*) Given Defendant's denial that Plaintiff made any requests for FMLA leave in 2014, (Def.'s Mem. 15–17), there is a genuine issue of fact as to whether Plaintiff exercised her rights under the FMLA, *see Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F. Supp. 2d 423, 428 (S.D.N.Y. 2007) (denying summary judgment because "whether [plaintiff] provided notice as required by the FMLA, and therefore whether she exercised rights protected under the FMLA, is a disputed question of fact"); *see also Santiago v. Butler Co.*, No. 3:08-CV-1297 CSH, 2012 WL 527699, at *3 (D. Conn. Feb. 17, 2012) ("While Plaintiff does not allege that he mentioned the FMLA, his alleged request nevertheless constituted an exercise of his rights under the FMLA.").

Defendant argues that Plaintiff cannot rely on self-serving statements in an affidavit to create a genuine issue of fact. (Def.'s Reply 2.) That is not the law. Rule 56 specifically states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). "There is nothing in [Rule 56] to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against a motion for summary judgment." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998).

Defendant argues that Plaintiff's affidavit contradicts her deposition testimony on this

issue, requiring me to disregard Plaintiff's affidavit in whole. (Def.'s Reply 3.) In particular, Defendant claims that Plaintiff's affidavit contradicts her deposition testimony that: (1) she never completed any "required" FMLA forms; (2) she never requested a medical provider to complete a medical certification; (3) she never submitted any completed FMLA forms or medical certifications to UCP; (4) she could have requested FMLA paperwork from UCP's Human Resources Department, but failed to do so; and (5) Jefferally did not actually deny Plaintiff's FMLA leave requests, but rather never gave her UCP's FMLA forms. (*Id.*) Based on the record before me, I do not find that Plaintiff's affidavit contradicts her deposition testimony. First, Plaintiff's affidavit never asserts that she (1) completed any "required" FMLA forms; (2) requested a medical provider to complete a medical certification; (3) submitted completed FMLA forms or medical certifications to UCP; or (4) could not have requested FMLA paperwork from UCP's Human Resources Department.[12] (*See generally* Ladepo Aff.) As such, Plaintiff's affidavit does not and cannot contradict her deposition testimony to the contrary. Second, Plaintiff did testify that Jefferally never gave her UCP's FMLA forms, (*see* Ladepo Dep. 216:22-217:12, 249:3-5, 253:16-254:11), which is consistent with her affidavit, (Ladepo Aff. ¶ 16), but she did not testify that Jefferally never denied her leave. Rather, Plaintiff testified that, in response to at least one request, Jefferally told Plaintiff that he did not have anyone to fill Plaintiff's shifts and could not do anything about or approve Plaintiff's requests. (Ladepo Dep. 248:21-249:2, 251:5-11, 260:14:261:8.)

Defendant further argues that Plaintiff has failed to show that she satisfactorily performed her job, and thus, Plaintiff has failed to establish that she was qualified for her position. (Def.'s

---

[12] As discussed below, it is a factual question whether any of these actions were required to provide sufficient notice under the FMLA, and thus to establish whether Plaintiff exercised her rights under the FMLA.

Mem. 17–18.) Defendant misstates what is necessary to establish this element in making a prima facie showing. As the Second Circuit has explained, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001). The qualification prong is not meant "to shift onto the plaintiff an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Id.* Rather, "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job." *Id.* (internal quotation marks omitted). In cases of allegedly discriminatory discharge where "the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Id.* UCP hired Plaintiff to the same position from which she was ultimately terminated, and UCP has not established that Plaintiff misrepresented her skills or qualifications when applying for her job. As such, I find that Plaintiff has met her prima facie obligation of establishing her "minimal qualification" for the position.

Finally, Defendant argues that Plaintiff's termination did not occur under circumstances giving rise to an inference of retaliatory intent. (Def.'s Mem. 18–19.) In particular, Defendant argues that Plaintiff's history of disciplinary problems prior to her protected activity eliminates any inference of retaliation. (*Id.*)

"Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95. Here, timing is one basis for Plaintiff's retaliation claim—UCP terminated Plaintiff three days after she last requested FMLA leave,

(Ladepo Aff. ¶¶ 21–23)—but it is not the only basis.  Plaintiff also cites as bases for an inference

of retaliation:  (1) Jefferally's repeated denials of her FMLA leave requests in 2014, and (2)

Centrone's June 30, 2014 email.  (Pl.'s Opp. 13–14.)[13]  In particular, Plaintiff asserts that

Jefferally's denials of Plaintiff's FMLA requests resulted in the need for Plaintiff to take

unexcused absences in late June 2014, which served, at least in part, as the basis for her

termination.  (*Id.*)

Although Plaintiff's unexcused absences were caused, according to Plaintiff, by

Jefferally's denials of Plaintiff's FMLA requests, there is no evidence linking the decision to

terminate Plaintiff to her exercise of FMLA rights—namely, her 2014 requests for FMLA leave.

Centrone's June 30, 2014 email specifically referenced Plaintiff's "unexpected call outs," as well

as her "history of poor work performance," as a basis for Centrone's desire to terminate Plaintiff.

(Elkins Aff. Ex. A.)  It did not state that Plaintiff's requests to take FMLA leave motivated his

recommendation to terminate her.  Similarly, Elkins's May 13, 2014 email recommending the

termination of Plaintiff did not reference Plaintiff's requests for FMLA leave.  (*Id.*)  Rather, it

cited Plaintiff's "unruly behavior" and "inability to manage her emotions and remain

professional."[14]  (*Id.*)  In addition, Plaintiff does not dispute that she was counseled and/or

---

[13] "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed July 28, 2017.  (Doc. 58.)

[14] Plaintiff objects to the admissibility of paragraph 12 of and Exhibit A to the Elkins Affidavit on the basis that Elkins does not have personal knowledge of the facts stated.  (Counter 56.1 ¶¶ 91–92, 94–95, 99.)  In particular, paragraph 12 and Exhibit A both reference two incidents where McTiernan overheard Plaintiff yelling in front of residents about her co-workers and about being transferred to a new apartment, which resulted in Plaintiff being counseled for unprofessional behavior.  (*Id.*)  However, I do not take the evidence for the truth of the matter asserted, but rather as evidence of Elkins's state of mind when she wrote the May 13, 2014 email recommending the termination of Plaintiff.  *See Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 323 (S.D.N.Y. 2010) (holding that documents reflecting state of mind of employer in discrimination case were admissible); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, . . . [courts] are decidedly not interested in the truth of the allegations against plaintiff.  [Courts] are interested in what *motivated* the employer; the factual validity of the underlying imputation against the employee is not at issue." (citation and internal quotation marks omitted)).

disciplined on fourteen of the sixteen occasions cited by Defendant throughout her employment at UCP, including several occasions before she made the 2014 FMLA requests.[15] (Counter 56.1 ¶ 36.) As such, I find that Plaintiff has failed to introduce sufficient evidence to create a genuine issue of fact with respect to whether UCP terminated her under circumstances creating an inference of retaliatory intent. *See Williams v. N.Y.C. Health & Hosps. Corp.*, No. 11 Civ. 9456(KBF), 2012 WL 5506128, at *6 (S.D.N.Y. Nov. 13, 2012) ("That plaintiff's lateness and absenteeism may be attributable to his own and his family's medical conditions is insufficient to give rise to an inference of retaliatory intent. Defendants repeatedly counseled plaintiff for being late and being absent, not for taking care of himself and his family. . . . The mere fact that plaintiff's termination followed a request for FMLA leave would not permit a jury to find that defendant's claimed reasons for termination (excessive lateness and absenteeism) are pretextual."). Moreover, I find that based on the undisputed history of disciplinary problems, including incidents that warranted counseling and reprimands, and the fact that certain of these disciplinary problems related to Plaintiff's interacting with and treatment of residents—the core function of the Castleton IRA—a reasonable jury could not find that the termination of Plaintiff's employment occurred under circumstances giving rise to an inference of retaliatory intent. Defendant's motion is therefore granted with respect to Plaintiff's retaliation claim.

### B. *Interference*

#### 1. Applicable Law

To establish a claim for interference under the FMLA, a plaintiff must establish: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by

---

[15] For some of the incidents for which Plaintiff concedes she was counseled and/or disciplined, she disputes the conduct cited by Defendant as the basis for the counseling and/or discipline. (*See, e.g.*, Counter 56.1 ¶¶ 37–40, 45–46, 47–49, 65–66.) However, Plaintiff does not present evidence suggesting that any type of discriminatory or retaliatory animus motivated those instances of counseling and/or discipline.

the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio*, 817 F.3d at 424. A plaintiff must only establish that an "employer in some manner impeded the employee's exercise of his or her rights protected" by the FMLA. *Di Giovanna*, 651 F. Supp. 2d at 199 (citation omitted); *see also* 29 C.F.R. § 825.220(b) ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").

## 2. Application

Defendant does not contest that Plaintiff has met the first or second prongs of the standard to establish interference. Rather, it argues that Plaintiff's interference claim fails because: (1) she did not provide UCP with notice of her intention to take FMLA leave; (2) UCP did not deny her benefits to which she was entitled under the FMLA because she never submitted FMLA forms or medical documentation to UCP in 2014; and (3) Plaintiff's termination was motivated only by legitimate reasons.[16] (Def.'s Mem. 22–24.)

As mentioned above, there is a genuine issue of fact with respect to whether Plaintiff provided UCP notice of her intention to take FMLA leave. "The critical question [concerning whether adequate notice was provided] is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Avila-Blum*, 519 F. Supp. 2d at 427 (quoting *Darboe v. Staples, Inc.*, 243 F.Supp.2d 5, 17 (S.D.N.Y. 2003)). Plaintiff claims she provided notice of her request to take FMLA leave

---

[16] I note that, apart from its argument that Plaintiff did not provide adequate notice, Defendant does not argue that Plaintiff was not entitled to FMLA leave.

on five separate occasions in 2014, four of which were immediately denied. (Ladepo Aff. ¶¶ 12–22.) On each occasion, Plaintiff either specifically asked for FMLA leave or indicated that she needed leave to take care of her son as a result of his seizures.[17] (*Id.*) Defendant denies that Plaintiff ever requested leave in 2014, but asserts that even accepting her claims as true, the notice she provided was insufficient, as she failed to provide medical documentation or comply with UCP's usual and customary notice and procedural requirements. (Def.'s Mem. 22–24.)

As an initial matter, Defendant has not established that Plaintiff was under any duty to provide medical documentation. "Under the FMLA, an employee seeking leave need not submit a medical certification *unless and until one is specifically requested by her employer*." *Graziadio*, 817 F.3d at 426. Defendant has presented no evidence that it ever requested a medical certification from Plaintiff in 2014. Indeed, Defendant denies that Plaintiff ever requested FMLA leave in 2014 in the first place. (Jefferally Aff. ¶ 38.) Moreover, Plaintiff contends that she did provide medical documentation on at least one occasion, but Jefferally refused to accept it. (Ladepo Aff. ¶¶ 21–22.) There is, therefore, at least a factual dispute with regard to the issue of medical documentation.

Second, Defendant has similarly not established that Plaintiff was under any duty to comply with its usual and customary procedures for requesting FMLA leave. The only evidence before me of UCP's usual and customary procedures for requesting FMLA leave is that "UCP's FMLA policy provides that employees must submit written notice of the need for FMLA leave at least (30) thirty days in advance of the start of the leave when the need for such leave is reasonably foreseeable or as soon as possible when the need for such leave is unforeseeable."

---

[17] UCP was on notice that Plaintiff's son's had a qualifying medical condition under the FMLA, as UCP had granted Plaintiff FMLA leave to care for her son as a result of his seizures in 2013. (Ladepo Aff. ¶¶ 8–9; Counter 56.1 ¶¶ 29–32.)

(Counter 56.1 ¶ 19.)  However, "in the case of an emergency requiring leave because of a FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved."  29 C.F.R. § 825.303(c). Plaintiff's need for leave involved her son's sudden seizures, or medical procedures and complications associated with those seizures, requiring Plaintiff to care for him and accompany him at the hospital.  (Ladepo Aff. ¶¶ 14–22.)  Plaintiff has thus presented sufficient evidence to create a genuine issue of fact with respect to whether any of her requests in 2014 involved emergency situations eliminating the need for advance written notice.

Even if Plaintiff did have a duty to provide medical documentation or follow Defendant's usual and customary procedural requirements, there is a genuine issue of fact as to whether she had the opportunity to do so.  Plaintiff has presented evidence that Jefferally rejected her FMLA leave requests outright when she initially made them, thus preventing her the opportunity to provide medical documentation or comply with UCP's usual and customary notice procedures. (*Id.*)  Based on the evidence in the record, a reasonable jury could find that Plaintiff was relieved of any duties to provide further information or follow any particular procedural requirements to seek leave because the conduct of Defendant indicated that doing so would be futile.  *Graziadio*, 817 F.3d at 428 (denying summary judgment where there was a genuine issue of fact as to whether Defendant's conduct "relieved [plaintiff] of any unsatisfied obligation to provide a medical certification to support her leave").

Because a reasonable jury could conclude that Plaintiff was entitled to benefits under the FMLA, a reasonable jury could also conclude that UCP's purported denial of Plaintiff's FMLA requests constituted a denial of benefits under the FMLA.  As such, there is a genuine issue of fact as to the final prong of the standard for interference claims.

Finally, Defendant claims that Plaintiff's interference claim should fail because Plaintiff has failed to show that her termination was motivated by anything but legitimate reasons. However, the employer's intent is irrelevant to the standard for establishing an interference claim. *See id.* at 424 (not listing intent of the employer as an element for an interference claim). A plaintiff need only establish that an "employer in some manner impeded the employee's exercise of his or her rights protected" by the FMLA. *Di Giovanna*, 651 F. Supp. 2d at 199 (citation omitted). Plaintiff has done so here. Therefore, Plaintiff's FMLA interference claim survives.

### C. *Associational Discrimination*

#### 1. Applicable Law

Plaintiff asserts a claim for disability association discrimination under the NYCHRL. The NYCHRL provides that "[i]t shall be unlawful discriminatory practice . . . [f]or an employer . . ., because of the actual or perceived . . . disability . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person." N.Y.C. Admin. Code § 8-107(1)(a). Further, "[t]he provisions of this section set forth as unlawful discriminatory practices shall be construed to prohibit such discrimination against a person because of the actual or perceived . . . disability . . . of a person with whom such person has a known relationship or association." *Id.* § 8-107(20). The NYCHRL thus provides a cause of action for disability association discrimination. *See Abdel-Khalek v. Ernst & Young, L.L.P.*, No. 97 CIV. 4514 JGK, 1999 WL 190790, at *9 (S.D.N.Y. Apr. 7, 1999) ("Under the plain language of [the NYCHRL], there is a claim for disability association discrimination . . . .").

"To establish a prima facie case of discrimination under the NYCHRL, a plaintiff must show 'that her employer treated her less well than other similarly situated employees, at least in

part for discriminatory reasons.'" *Kops v. PPM Am., Inc.*, No. 15 Civ. 1584 (GBD), 2016 WL 7188793, at \*5 (S.D.N.Y. Dec. 5, 2016) (quoting *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013)).  An employer may present a legitimate, non-discriminatory reason for its actions, but it is entitled to summary judgment "only if the record established as a matter of law that discrimination played *no* role in its actions."  *Id.* (quoting *Bloomberg L.P.*, 967 F. Supp. 2d at 836).  A court must evaluate "the totality of the circumstances . . . because 'the overall context in which the challenged conduct occurs cannot be ignored.'"  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (quoting *Hernandez v. Kaisman,* 957 N.Y.S.2d 53, 59 (1st Dep't 2012)).

Claims under the NYCHRL are to be construed "separately and independently from federal and state discrimination claims." *Id.*  The New York City Council amended the NYCHRL "to require . . . its provisions [to] be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws . . . have been so construed."  *Id.* at 109 (internal quotation marks omitted).  Claims under the NYCHRL "must be reviewed . . . more liberally than their federal and state counterparts."  *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted).

### 2. Application

Defendant contends that Plaintiff has failed to establish a link between her son's medical condition and her termination sufficient to show that there was any discriminatory motivation. (Def.'s Mem. 24–25.)  I disagree.  Centrone's June 30, 2014 email recommending Plaintiff's termination clearly indicates that one of the reasons for his recommendation was Plaintiff's absences to care for her "disabled son who tends to have frequent medical issues."  (Elkins Aff.

Ex. A.)  Although, as discussed above, Centrone's email does not establish a link between Plaintiff's termination and Plaintiff's FMLA requests, it does establish a link between Plaintiff's termination and Plaintiff's absences, which Centrone knew were at least partially a result of the need to care for her son.  (*See id.*)  Given the "uniquely broad and remedial purposes" of the NYCHRL, and based on the "totality of the circumstances" and the "overall context in which the challenged conduct occur[red]," *Mihalik*, 715 F.3d at 109 (citation omitted), I find that a reasonable jury could conclude that Defendant discriminated against Plaintiff based on her association with her son.

## V.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Specifically, Defendant's motion for summary judgment is granted with respect to Plaintiff's FMLA retaliation claim and denied with respect to Plaintiff's FMLA interference and NYCHRL claims.  Within thirty (30) days of the entry of this Opinion & Order, the parties shall submit a joint pretrial order in accordance with Rule 6(A) of my Individual Rules & Practices in Civil Cases.  On the same date, the parties shall also propose trial dates and a schedule for pretrial submissions pursuant to Rule 6(B) of my Individual Rules & Practices in Civil Cases.

The Clerk of Court is respectfully directed to terminate the open motion at Document 48.

SO ORDERED.

Dated: September 12, 2018
        New York, New York

Vernon S. Broderick
United States District Judge

26